IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| MARK A. RAISBECK, ) | Case No. 08 C 50075 |
| ) | |
| Plaintiff, ) | |
| vs. ) | Magistrate Judge |
| ) | P. Michael Mahoney |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

### I.      Introduction

Mark Raisbeck seeks judicial review of the Social Security Administration

Commissioner's ("the Commissioner") decision to deny his applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under Sections 216(i), 223(d),

1611, and 1614 of the Social Security Act.  *See* 42 U.S.C. §§ 416(i), 423, 405(g), 1381(a),

1382(a), and 1383(c)(3).  This matter is before the Magistrate Judge pursuant to the consent of

both parties, filed on July 17, 2009.  *See* 42 U.S.C. § 405(g); 28 U.S.C. § 636(c); Fed. R. Civ. P.

73.

### II.      Administrative Proceedings

The record indicates that Claimant has filed previous applications for a period of

disability, and disability insurance benefits.  (Tr. 12.)  His most recent alleged onset date prior to

this case was September 15, 1998.  (Tr. 12.)  The Commissioner denied his claim on June 19,

2001.  (Tr. 12.)[1]

Claimant reapplied for DIB and SSI on November 10, 2005, alleging a disability onset date of September 15, 1998.  (Tr. 49, 134.)  The Social Security Administration ("SSA") denied Claimant's applications initially on February 3, 2006,  and upon reconsideration on May 16, 2006.  (Tr. 31, 39.)  At Claimant's request, the Administrative Law Judge ("ALJ") conducted a hearing into Claimant's application for benefits on April 25, 2007.  (Tr. 150.)  Claimant was represented by counsel and testified at the hearing.  (Tr. 150.)  Catherine Anderson, a vocational expert, also testified at the hearing.  (Tr. 170.)   The ALJ considered Claimant's age, education, past work experience, and residual functional capacity ("RFC"), and concluded that Claimant was not disabled as defined in the Social Security Act because he was capable of performing a significant number of jobs in the national economy.  (Tr. 20–21.)  The Appeals Council denied Claimant's Request for Review regarding the ALJ's opinion on August 31, 2007.  (Tr. 4–6.)  Therefore, the ALJ's 2007 opinion constitutes the final decision of the Commissioner (Tr. 4–6.)

## III.    Background

Claimant was born on September 26, 1957, making him 43 years old at the time of the earliest possible disability onset date for this claim, and 49 years old at his hearing.  (Tr. 147.)  Claimant has lived with his niece since he sold his house due to financial difficulties in July 2006.  (Tr. 154–55.)  He is single and has a 25 year old son.  (Tr. 154.)

Claimant completed two years of high school and attended one year of college prior to

---

[1]The ALJ in this case found that Claimant was "not disabled" from his first alleged onset date of September 15, 1998 through June 19, 2001, the day after his first claim was denied.  (Tr. 12, 14.)  Thus, ALJ determined that the earliest onset date Claimant could allege was June 20, 2001.  (Tr. 12, 14.)

beginning his employment. (Tr. 61.) His past work includes employment as a laborer at an automotive factory, and as a packer at a cheese manufacturer. (Tr. 63–64.) At Argyle Industries, Claimant disassembled brake and master cylinders from 1984 until 1996. (Tr. 57, 63.) He packaged and loaded cheese at Mexican Cheese Producers from 1997 until 1998. (Tr. 57, 64.) Both of these positions are considered heavy, unskilled labor, which require mostly standing and walking, lifting 50 pounds frequently, constant reaching, and handling large and small objects. (Tr. 98.) Claimant had surgery on his back in 1989, and claims lower back pain ever since. (Tr. 122, 106.) In February 1997, Claimant caught his left hand in an auger at work, which resulted in the amputation of four fingers. (Tr. 56, 60.)

The ALJ conducted a hearing on April 25, 2007. (Tr. 147–81.) Claimant testified that he was last employed by Mexican Cheese Producers in 1998. (Tr. 151–52.) He testified that he had done some odd jobs for a friend, including cleaning up debris at a farm to prepare it for an auction. (Tr. 152.) This involved picking up junk and chaining old farm equipment to a Bobcat to be hauled away. (Tr. 152.) Claimant noted that he had not received recent treatment for his back and only took aspirin approximately once every two weeks because he was unable to afford more extensive care. (Tr. 158.) He testified that his back pain increased when he bends over and after long periods of sitting. (Tr. 159.) He also noted that he had been having knee pain, and that his ligaments were getting bad. (Tr. 159–60.) Claimant stated that he was able to walk a mile. (Tr. 160.) He testified that he had trouble reading big words, and needed assistance when he filled out paperwork for his disability claim. (Tr. 160.) He testified that his left hand gave him difficulties with doing dishes, sweeping, mopping, and folding clothes. (Tr. 162.) He has a valid drivers license and is able to drive his manual transmission truck without difficulty.

(Tr. 163–64.)  Claimant testified that he enjoys deer hunting with a crossbow and a shotgun, and is able to load and pump his shotgun without assistance.  (Tr. 164–65.)  However, he described problems keeping his left hand warm while hunting.  (Tr. 167.)  He noted that he always hunted by himself, but required assistance with hauling the deer out of the woods.  (Tr. 168.)  He also testified that he enjoyed fishing, but had not been in three years.  (Tr. 165.)

## IV.    Medical Evidence

In April 2001, Dr. Jankus, a consulting physician in Neenah, Wisconsin, examined Claimant pursuant to his disability claim.  (Tr. 101.)  Dr. Jankus described several physical problems alleged by Claimant during the visit.  He noted Claimant's problems pinching and gripping caused by his amputated digits, and hypersensitivity in the stump tips of the digits.  (Tr. 101.)  Claimant also described pain and sensitivity in the ventral aspect of his palm, and in the MCP joints of his index, middle, and ring fingers.[2]  (Tr. 101.)  Claimant noted that these problems with his left hand give him difficulties with playing softball, fishing, hunting, doing dishes, and gripping heavy tools.  (Tr. 101.)  He stated that cold weather aggravates his hand injuries.  (Tr. 101.)  Claimant said he was able to do his own self care activities and household chores using mostly his right hand.  (Tr. 101.)  Claimant estimated that his left hand worked in the range of 15–20% as well as his right hand, and reported that if he did not have hand problems he would otherwise be unlimited.  (Tr. 102.)  He did not describe any difficulties with lower extremity function.  (Tr. 102.)  Claimant told Dr. Jankus that he was able to do some part time

---

[2]MCP is an abbreviation of metacarpophalangeal, which means "relating to the metacarpus and the phalanges; denoting the articulations between them." *Stedman's Medical Dictionary* 1193 (28th ed. 2006).  The ventral aspect of the palm refers to its anterior, or under side. *Id.* at 2114.

construction work for a friend, but could only sustain activity for a couple of hours before he had to stop and rest.  (Tr. 102.)  Dr. Jankus documented Claimant's ability to use his left hand.  (Tr. 102.)  Claimant primarily used a pinching technique between this fourth and fifth digits, and demonstrated that he could tie his shoes, unbutton his shirt and pants, and take off his sweater.  (Tr. 102–3.)  Dr. Jankus confirmed Claimant's hypersensitivity and inability to tolerate firm gripping, firm pinching, heavy lifting, and cold environments.  (Tr. 103.)  He opined that Claimant's estimate of 15–25% function in his left hand was reasonable, and that Claimant had lost all practical function of his left hand other than the pincher mechanism between his fourth and fifth digits.  (Tr. 103.)  Dr. Jankus concluded that any work should be confined to Claimant's right hand.  (Tr. 103.)  Finally, he noted that Claimant completed two years of high school, attended special education courses because of a learning disability, and had never been good at writing.  (Tr. 103.)

In January of 2006, Dr. Stenberg at Tri-State Occupational Health in Dubuque, Iowa examined Claimant at the request of the Wisconsin Disability Determination Bureau.  (Tr. 104.)  Dr. Stenberg described Claimant's hand injury as a partial amputation of the distal phalanx of the thumb, complete amputation of the index finger at the MCP joint, amputation of the long finger at the PIP joint, and partial amputation of the tip of the ring finger including most of the nail bed.[3]  (Tr. 104.)  Claimant described marked limitation in the motion of his left hand.  (Tr. 104.)  Claimant completed and submitted a questionnaire regarding his injuries  prior to the

---

[3]The distal phalanx are the outer phalanges, which are "long bones of the digits, 14 in number for each hand and foot, including two for the thumb or great toe, and three each for the other four digits."  *Id.* at 1471.  PIP is an abbreviation for proximal interphalangeal, or  nearest the trunk or point of origin between two phalanges.  *Id.* at 1586, 990.

appointment. (Tr. 104.) On the questionnaire, Claimant did not shade-in any areas of pain on the diagram, and reported no pain in his upper body or arm. (Tr. 104.) He noted pain in his left wrist, and pain in his lower back about three-quarters of the time, ranging from 0–8 on the analog pain scale. (Tr. 104.) Claimant stated that he experienced his worst pain in 1990 after he injured his back, and that he had no numbness or tingling in his lower extremities. (Tr. 104.) Dr. Stenberg noted that Claimant's left hand gets cold quickly. (Tr. 104.) Claimant stated that he could sit for approximately two hours before his back got stiff, stand for between four and eight hours a day, and walk a mile without difficulty. (Tr. 105.) He also stated that he has no difficulty kneeling or crawling, and that he is independent in activities of daily living such as bathing and dressing. (Tr. 105.) Claimant cited an increase in lower back pain when he bends forward, and stated that the most he lifts is 10 pounds. (Tr. 105.) Claimant was able to exert 46 kg of force with his right hand and 18 kg of force with his left hand, but stated that it was painful. (Tr. 105.) Dr. Stenberg noted Claimant's marked decreased motion with the left thumb and extremely weak pinching mechanism between his thumb to ring and small finger. (Tr. 106.) He noted that Claimant had normal range of motion with his left knee, but also had marked crepitus with both active and passive flexion and extension.[4] (Tr. 106.) Accordingly, Dr. Stenberg opined that Claimant should not perform occupations that would require him to stoop, squat, kneel, or crawl. (Tr. 106.) Dr. Stenberg also reported on Claimant's side bending, extension, and flexion of his spine. (Tr. 106.) He noticed lower back pain at the end range of motion, when Claimant's fingers were about six inches from his toes. (Tr. 106.) Claimant was

---

[4]Crepitus, or crepitation, is "noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions." *Id.* at 457.

able to squat down to the floor and rise to the standing position. (Tr. 106.) Dr. Stenberg diagnosed Claimant with chronic back pain and amputation of several digits of the left hand with ongoing weakness. (Tr. 106.) Dr. Stenberg opined that Claimant was impaired because he had effective use of only one hand, which would prevent him from working at heights or on ladders. (Tr. 106.) He also noted that Claimant would have no difficulty climbing stairs or lifting and carrying 10 pounds on a frequent basis. (Tr. 106.) He found no impairment in Claimant's ability to stand, walk, move about, or sit for an eight-hour work day given appropriate work breaks. (Tr. 106.) Finally, Dr. Stenberg requested an x-ray of Claimant's spine. (Tr. 107.) The x-ray revealed mild lumbar degenerative changes with disk space narrowing between the L3–4 and L5–S1 levels and no evidence of acute traumatic. (Tr. 107.)

In January 2006, Dr. Foster, a non-examining, consulting physician, conducted a Physical Residual Functional Capacity ("RFC") Assessment on Claimant based on his hand, back, and knee problems. (Tr. 113–120.) Dr. Foster classified Claimant's RFC as light work. (Tr. 114, 123.) In his opinion, Claimant could ordinarily lift 20 pounds, frequently lift 10 pounds, stand/walk about six hours in an eight-hour work day, and sit about six hours in an eight–hour work day. (Tr. 114.) He indicated that Claimant had no postural, visual, communicative, or environmental problems. (Tr. 115–17.) He also noted that Claimant had a limited ability in pulling, pushing, handling, fingering, and feeling. (Tr. 116.) In May 2006, Dr. Baumblatt, M.D., reviewed the evidence and affirmed Dr. Foster's RFC assessment. (Tr. 121.)

In February 2007, Claimant visited Dr. Krieger at Blankenheim Services in Appleton, Wisconsin for an employment screening pursuant to his application for a welding position. (Tr. 133.) Dr. Krieger found that Claimant experienced some left shoulder pain with overhead range

of motion. (Tr. 133.) He also noted Claimant's irritable ulnar nerve, Tinel sign, and finger

vibrations with wrist Tinel sign.[5] (Tr. 133.) He measured Claimant's grip strength at 110

pounds on the right and 43 pounds with pain on the left. (Tr. 133.) He also found that Claimant

experienced lower back pain with bilateral rotation, knee pain with flexing, and pain on the

bottom of his left foot with flexing. He stopped Claimant's 20–25 pound lift test due to pain.

(Tr. 133.) Dr. Krieger recommended that Claimant limit use of his left hand and arm. (Tr. 133.)

He also limited Claimant's lifting with both hands to 15 pounds, and suggested that he do

minimal twisting of his torso during work activities. (Tr. 133.) Finally, he noted that these

restrictions were to be permanent. (Tr. 133.)

## V.    Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the

proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal

conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997).

However, the court "may not decide the facts anew, reweigh the evidence or substitute its own

judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts,

make independent findings of fact, and decide the case are entrusted to the Commissioner.

*Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows

reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for

that decision falls on the Commissioner.").

---

[5]Ulnar nerve is a nerve coming from the medial and larger of the two bones in the forearm. *Id.* at 2063. Tinel sign is "a sensation of tingling, or of "pins and needles", felt at the lesion site or more distally along the course of a nerve when the latter is percussed; indicates a partial legion or regeneration in the nerve." *Id.* at 1772.

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.    Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3); 1382c(a)(3)(D).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520; 416.920. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of

Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VII. Analysis

### A. Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b); 416.920(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. §§ 404.1510; 416.910. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ stated, "The claimant has not engaged in substantial gainful activity since June 20, 2001, the alleged onset date." (Tr. 15.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B. Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires the ALJ to determine whether the claimant suffers from a severe impairment. A severe impairment is any impairment, or combination of impairments, which significantly limits the claimant's physical or mental ability to do basic work activities. 20

C.F.R. §§ 404.1520(c); 416.920(c).[6]  The claimant's age, education, and work experience are not

considered in making a Step Two severity determination.  20 C.F.R. §§ 404.1520(c); 416.920(c).

If the claimant suffers a severe impairment, then the inquiry moves to Step Three; if not, then the

claimant is found to be not disabled, and the inquiry ends.

    In performing the Step Two analysis in this case, the ALJ noted that Claimant had the

following impairments: degenerative changes with L3–4 and L4–5 disk space narrowing and

status post multiple finger amputation on his left hand.  (Tr. 15.)  Because these medically

determinable conditions significantly limited Claimant's ability to perform basic work activity,

the ALJ recognized these impairments as "severe impairments" under 20 C.F.R. §§ 404.1520(c)

and 416.920(c).  (Tr. 15.)  Neither party disputes this determination.  As such, the court affirms

the ALJ's Step Two determination.

## C.    Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?

    At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404,

subpt. P, app. 1 (the "listings").  The listings describe, for each of the body's major systems,

impairments which are considered severe enough *per se* to prevent a person from doing any

significant gainful activity.  20 C.F.R. §§ 404.1525(a); 416.925(a).  The listings streamline the

decision process by identifying certain disabled claimants without need to continue the inquiry.

*Bowen v. New York*, 476 U.S. 467 (1986).  Accordingly, if the claimant's impairment meets or is

medically equivalent to a listed impairment, then the claimant is found to be disabled and the

---

[6] The claimant need not specify a single disabling impairment, as the Commissioner will
consider combinations of impairments.  *See, e.g.*, 20 C.F.R. § 404.1520(c).  To simplify, this
generic discussion of the Commissioner's decision–making process will use the singular
"impairment" to include both singular and multiple impairments.

inquiry ends; if not, the inquiry moves to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant's impairment did not meet or medically equal the level of severity contemplated for any impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 16.) Neither party disputes this determination, and thus the ALJ's Step Three determination is affirmed.

**D.     Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines Claimant's RFC, and whether the RFC allows Claimant to return to past relevant work. RFC is a measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC assessment is based upon all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id.* Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

In performing the Step Four analysis in this case, the ALJ determined that Claimant has the RFC to perform light work with frequent lifting/carrying up to 10 pounds and occasional lifting/carrying of up to 20 pounds.[7] (Tr. 16.) The ALJ found that Claimant has no practical use

_____

[7]The ALJ's opinion explicitly stated that Claimant could frequently lift/carry 20 pounds and occasionally lift/carry up to 10 pounds. (Tr. 16.) This statement runs counter to basic logic and the rest of the ALJ's opinion. An individual limited to lifting/carrying 10 pounds occasionally would be unable to lift/carry 20 pounds frequently. The ALJ found that Claimant could perform only light work, which is defined as frequent lifting/carrying 10 pounds, and lifting no more than 20 pounds at a time. 20 C.F.R. § 404.1567(b). Further, the ALJ described

12

of his left hand.  (Tr. 16.)  The ALJ also found Claimant can sit for six hours and stand for six hours of an eight hour workday.  (Tr. 16.)

In determining Claimant's RFC, the ALJ specified the weight that he gave to each medical source.  The ALJ specifically accorded substantial weight to Dr. Jankus' opinion that Claimant would have no practical use of his left hand in a work setting.  (Tr. 19.)  Dr. Jankus noted Claimant's limited strength with his left hand and hypersensitivity in his digits.  (Tr. 103.)  His assessment that Claimant lost all practical function of his left hand comports with the ALJ's RFC determination.  (Tr. 16, 103.)  The ALJ's restriction to light work is also consistent with Dr. Jankus' finding that Claimant should be restricted from "heavy lifting."  (Tr. 103.)  The ALJ also considered that Claimant is right-handed.  (Tr. 19.)

In determining that Claimant was able to perform light work without practical use of his left hand, the ALJ accorded substantial weight to Dr. Krieger's assessment.  (Tr. 19.)  During this examination, Claimant had a grip strength of 110 pounds with his right hand and 43 pounds with his left.  (Tr. 19.)  Dr. Krieger stopped Claimant's 20–25 pounds lift test due to pain.  (Tr. 133, 19.)  Dr. Krieger suggested a 15 pound lifting restriction.  (Tr. 19.)

Claimant argues that the ALJ failed to include in Claimant's RFC the impairments to his back and knee, and his inability to read large words, drive, and maintain certain postures.  (Pl.'s Br. at 10–14.)  First, the ALJ adequately addressed Claimant's lower back pain when he incorporated lifting restrictions and standing/sitting durations into Claimant's RFC.  (Tr. 16.)  At

---

the Claimant's lifting restriction to a vocational expert as limited to lifting 20 pounds occasionally and 10 pounds frequently.  (Tr. 172.)  Thus, the court assumes, as do both parties, that the ALJ made a typographical error and meant to set Claimant's lifting restrictions at up to 20 pounds occasionally and 10 pounds frequently.

the hearing, Claimant testified that his back pain interferes with lifting, sitting in a chair, and bending over. (Tr. 158.) He testified that he must move around after sitting for two hours to prevent his back from becoming stiff. (Tr. 105.) Dr. Jankus' report did not contain any limitations or restrictions associated with Claimant's lower back. (Tr. 101–03.) Dr. Krieger's report noted that Claimant experienced lower back pain with bilateral rotation, that he had been restricted to lifting 25 pounds for "years and years," and that his 20–25 pound lift test was stopped due to pain. (Tr. 133.) The ALJ's RFC included light work, which is defined as frequent lifting/carrying 10 pounds and lifting no more than 20 pounds at a time, and a six hour sitting/standing restriction. 20 C.F.R. § 404.1567(b); (Tr. 16.) Dr. Krieger suggested a 15 pound lifting restriction, but the ALJ did not give that aspect of Dr. Krieger's opinion controlling weight. (Tr. 19.) Even if Claimant had a 15 pound lifting limitation, the VE testified that such a limitation would not change the number of jobs available in the economy. (Tr. 179–80.) Thus, whether Claimant has a 15 or 20 pound lifting restriction is inapposite in this case. Dr. Foster and Dr. Baumblatt evaluated Claimant's medical record and found the same lifting restriction as the ALJ. (Tr. 114, 121.) A reasonable mind could find that these restrictions adequately addressed Claimant's, Dr. Jankus', Dr. Krieger's, Dr. Foster's, and Dr. Baumblatt's assessments of Claimant's lower back pain. Dr. Stenberg noted Claimant's mild degenerative changes with disk space narrowing in his lower back, but also opined that he could "find no evidence today he would have any impairment in his ability to stand, walk, move about or sit for an 8-hour work day given appropriate breaks." (Tr. 106.) He also opined that claimant would "have no difficulty lifting and carrying 10 pounds on a frequent basis." (Tr. 106.) Dr. Stenberg's opinion that Claimant can lift 10 pounds without difficulty is consistent with the ALJ's determination of

14

Claimant's RFC. (Tr. 16.) Thus, the court finds that the ALJ's lifting restriction and sitting/standing durations addressed Claimant's lower back pain.

Second, there is little evidence in the record to suggest that Claimant has a mental impairment which should have been included in his RFC. He testified about his limited education and difficulty reading big words, and noted that he received help filling out paperwork for his DIB and SSI claims. (Tr. 61, 151.) He also told Dr. Jankus that he had a learning disability, attended special education classes in high school, and had never been good at writing. (Tr. 103.) The ALJ must use the special technique, which is outlined in the regulations, for evaluating mental impairments. 20 C.F.R. § 416.920(a). However, the regulations specify that a claimant must show a medically determinable impairment "by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms." 20 C.F.R. § 416.908. In this case, Claimant's alleged mental impairment is based on his statements to a doctor and at the hearing about his education level and general reading ability, and do not constitute signs, symptoms, or laboratory findings. The ALJ explicitly considered Claimant's education level when he conducted the Step Five analysis. (Tr. 20.) Further, neither the VE nor the record indicated that Claimant's intelligence has or will compromise his ability to successfully perform unskilled work. Thus, the court finds that the ALJ was not required to use the special technique and properly excluded mental limitations from Claimant's RFC.

Third, the record does not indicate that Claimant is limited in his ability to drive. Claimant has a valid driver's license without restriction and frequently drives his manual transmission truck without difficulty. (Tr. 163–64). He indicated that he drove to his mother's house, sister's house, and the grocery store. (Tr. 76.) The VE also testified that Claimant could

work as a driver despite having no practical use of his left hand. (Tr. 173.) Further, the record lacks evidence to support Claimant's position regarding his driving limitations, which is based on speculation. Thus, the court finds that the ALJ properly excluded driving limitations from Claimant's RFC.

Fourth, there was insufficient evidence in the record to require the ALJ to have included restrictions against stooping, squatting, kneeling, or crawling in Claimant's RFC. The two physicians' opinions to which the ALJ gave substantial weight did not recommend any restrictions based on Claimant's knee pain. (Tr. 103, 133.) Specifically, Dr. Jankus indicated that Claimant claimed that without his hand problems he would be "unlimited," and explicitly noted that there were no problems with lower extremity function. (Tr. 102.) Dr. Krieger noted that Claimant complained of posterior knee pain, but did not suggest restrictions to address it. (Tr. 133.) The only evidence in the record to suggest that Claimant had trouble in this regard was Dr. Stenberg's opinion that Claimant should not stoop, squat, kneel, or crawl. (Tr. 106.) However, Dr. Stenberg also noted that Claimant denied having difficulty kneeling or crawling, and indicated that he had no difficulty squatting to the floor and rising to the standing position. (Tr. 106.) Thus, the court finds that substantial evidence supports the ALJ's exclusion of restrictions against stooping, squatting, kneeling, and crawling in Claimant's RFC.

The ALJ also found that Claimant's statements were not entirely credible, and his "high level of functioning belie[d] a finding of disability." (Tr.17.) When a Claimant makes statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms that are not substantiated by objective medical evidence, the ALJ must make an assessment of Claimant's credibility based on the case record as a whole. 20 C.F.R. § 404.1529.

In doing so, the ALJ must consider (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measure used to relieve the pain, and (7) functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3).

The record contains substantial evidence regarding Claimant's daily activities to support the ALJ's conclusion that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible. The record only contained opinions from three non-treating physicians. (Tr. 101–03, 104–06, 133.) Accordingly, the ALJ properly relied on Claimant's daily activities to supplement the sparse medical record and reach his conclusion. The ALJ relied on Claimant's testimony that he lived alone, cared for his own daily needs, and did his own cleaning, shopping, laundry, and yard work. (Tr. 17.) He noted that Claimant had trouble shoveling snow, picking up flatware, and washing dishes. (Tr. 18.) He also mentioned that Claimant deer hunted every year and was able to load, pump, and fire his shotgun. (Tr. 18.) He noted that Claimant left his house daily to walk or drive. (Tr. 18.) Claimant stated that he walked for 45 minutes each day for exercise, and often drove to the grocery store or to visit his mother and sister. (Tr. 18.) He noted that Claimant had a valid, unrestricted driver's license and drove a manual transmission truck without difficulty. (Tr. 18.) The ALJ also noted Claimant's estimates that he could sit for about two hours, stand for about eight to 10 hours, and walk for about two or three hours. (Tr. 18.) He noted that Claimant's statement that he spent six or seven hours in bed corresponded to his statement that he slept for six or seven hours each night. (Tr. 18.) The ALJ noted that Claimant cleaned out a barn for a

friend over a four-day period in November 2006. (Tr. 18.) The ALJ relied on Dr. Jankus' report

that Claimant had done some part-time construction work for a friend in April 2001. (Tr. 18.)

He cited Claimant's statement that he could do most activity with his right hand, and that he

could pinch a nail between the 4th and 5th digits on his left hand and tap it down with a hammer

in his right hand. (Tr. 18.) The ALJ relied on Claimant's statement that he moved in with his

niece for financial reasons. (Tr. 18.) Finally, the ALJ noted that Claimant had not sought out

treatment for his back pain because he did not have money or medical insurance, and took

aspirin every couple of weeks. (Tr. 18.) The ALJ supported his credibility determination with

the above substantial evidence of Claimant's physical capabilities. The court finds that the ALJ

properly considered all of Claimant's physical capabilities and used them to create a logical

bridge to his credibility determination.

The ALJ determined that Claimant was unable to perform any of his past relevant work

given his RFC. (Tr. 19.) Past relevant work is work previously performed by the claimant that

constituted substantial gainful activity and satisfied certain durational and recency requirements.

20 C.F.R. §§ 404.1565(a), 416.965(a); S.S.R. 82–62. If the claimant's RFC allows him to return

to past relevant work, the claimant will not be found disabled; if the claimant is not able to return

to past relevant work, the inquiry proceeds to Step Five. The ALJ adopted the opinion of

Catherine Anderson, a vocational expert, that Claimant could not perform any past relevant

work. (Tr. 19.) Specifically, she stated that Claimant's past relevant work required heavy

exertion and Claimant was limited to unskilled, light work. (Tr. 19.) The ALJ relied on the

vocational expert's testimony, found her to be credible, and noted that she testified that her

assessment was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 19.) Thus,

the court affirms the ALJ's Step Four determination that Claimant is unable to perform past relevant work.

**E.    Step Five: Does Any Other Work Exist  in Significant Numbers in the National Economy Which Accommodates the Claimant's Residual Functional Capacity and Vocational Factors?**

At Step Five, the Commissioner determines whether the claimant's RFC and vocational factors allow the claimant to perform any job which exists in the national economy in significant numbers.  20 C.F.R. § 404.1560(c).  The burden is on the Commissioner to provide evidence that demonstrates that other work exists.  20 C.F.R. § 404.1560(c)(2).  In determining whether other work exists, the Commissioner considers the claimant's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, app. 2 (the "Guidelines").  The Guidelines direct a conclusion of "disabled" or "not disabled" upon a finding of a specific vocational profile.  (S.S.R. 83–11.)  The Guidelines represent exertional maximums, though, and if the claimant cannot perform substantially all of the exertional demands contemplated by the Guidelines, a conclusion cannot be directed without first considering the additional exertional limitations.  (S.S.R. 83–11 & 83–12.)  A vocational expert's testimony, if it is reliable, can satisfy the Commissioner's burden of determining whether a significant number of jobs exist in the economy.  *Overman v. Astrue*, 546 F.3d 456, 2008 U.S. App. LEXIS 21016, at *18 (7th Cir. 2008).

The ALJ found that Claimant was a "younger individual" on the alleged onset date, had a high school education, and was able to communicate in English.  (Tr. 19.)  The ALJ noted that transferability of job skills was not an issue in this case because Claimant's past relevant work was unskilled.  (Tr. 19.)

19

The vocational expert answered hypothetical questions that the ALJ posed to her at the hearing to determine whether work existed in significant numbers in the national economy that Claimant could perform. (Tr. 168–81.) Prior to giving her testimony, the ALJ asked her to inform him if any of her testimony conflicted with the DOT or the Selected Characteristics of Occupations ("SCO"). (Tr. 171–81.) The vocational expert did not indicate that her testimony was in conflict with the DOT or the SCO. (Tr. 171.) S.S.R. 00–4p specifies that an ALJ must obtain a reasonable explanation for any conflicts between the vocational expert's testimony and the DOT or SCO, but does not mandate a method or chronology that the ALJ must follow in doing so. The court recognizes that the ALJ's method of asking the VE to identify potential conflicts prior to her testimony is open to criticism. However, the court finds that the ALJ substantively complied with SSR 00–4p, and thus fulfilled his duty to inquire with the vocational expert about potential conflicts between her testimony, the DOT, and the SCO.

The vocational expert testified that an individual who could lift 20 pounds occasionally, 10 pounds frequently, sit for six out of eight hours, stand for six out of eight hours, and who had no practical use of their left hand could work at least three jobs in the economy. (Tr. 173–74.) The first occupation was a messenger/courier, which is classified as unskilled, light work with 2,998 positions in Wisconsin. (Tr. 173.) The second occupation was a driver, which is classified as unskilled, light work with 2,272 positions in Wisconsin. (Tr. 173.) The third occupation was a shipping/receiving clerk, which is classified as unskilled, light work with 1,970 positions available in Wisconsin. (Tr. 173.)

The ALJ asked the vocational expert if a restriction to sitting and standing in one hour intervals would affect her prior assessment. (Tr. 174.) She opined that the messenger/courier

position would be unaffected and that the number of driver positions would be reduced by 50 percent. (Tr. 174.) However, this restriction is not part of the Claimant's RFC, and thus the reduction is not applicable to the number of jobs available to Claimant in the economy. She also testified that an individual with no practical use of the left hand would be precluded from all sedentary work. (Tr. 175.) Claimant's counsel asked her if a reduction from 20 to 15 pounds in a claimant's occasional lifting limit would change her original evaluation. (Tr. 180.) She said it would not. (Tr. 180.) Claimant's counsel also asked if a restriction against stooping, squatting, kneeling, or crawling would affect her response. (Tr. 180.) She stated that such postural restrictions would not affect the driver or messenger/courier positions, but would reduce the number of available shipping/receiving clerk positions. (Tr. 180.) However, the ALJ did not include these postural limitations in Claimant's RFC. Prior to the hearing, Claimant told an examining physician that he had no difficulty kneeling or crawling, and the other two examining physicians omitted discussion of such limitations. (Tr. 105, 103, 133.)

Claimant argues that the VE's testimony was inconsistent with the DOT. Specifically, Claimant argues that the shipping/receiving clerk position is outside Claimant's RFC because it involves medium and either semi-skilled or skilled work. Claimant cites DOT # 222.387–050 in support of the argument.

At the hearing, the ALJ clarified with the VE that she was familiar with the terms unskilled, semi–skilled, and skilled. (Tr. 170.) He also confirmed that the VE was familiar with the classifications of sedentary, light, medium, heavy, and very heavy work. (Tr. 170.) As mentioned above, the ALJ confirmed that her testimony was not in conflict with the DOT or SCO. (Tr. 171.) The VE stated that Claimant could "additionally work as a shipping/receiving

clerk, unskilled, light, 1,978 positions." (Tr. 173.) The VE specified that the position involved

unskilled, light work, and never cited the DOT number that Claimant references. It appears that

the VE was referring to the shipping/receiving clerk position generally, and not using the term as

it is used in the DOT definitions.

Claimant's counsel had ample opportunity to cross examine the VE at the hearing to

clarify any perceived inconsistencies between her testimony and the DOT. (Tr. 175–81.) In

fact, when Claimant's counsel questioned the VE about the position, he called it the "shipping

clerk" position, and did not mention the DOT definition. (Tr. 180.) This suggests that he, at the

hearing, understood the VE to be using the term in the more general sense.

Similarly, the VE cited the "driver" position, which appears to be an "occupation" as

defined in S.S.R. 00–4p, rather than a specific DOT job number. There is also no specific listing

in the DOT for "messenger/courier." Even assuming the VE was referring to the specific

shipping/receiving clerk position that is outside the Claimant's RFC, substantial evidence in the

record still suggests that Claimant could perform 5,270 positions between the driver and

messenger/courier positions. (Tr. 173.)

The court finds that the ALJ properly accepted the VE's testimony that Claimant could

perform a significant number of jobs in the economy. The ALJ satisfied the Commissioner's

burden by relying on testimony from the VE that Claimant could perform approximately 7,242

jobs across three different occupations within the Wisconsin economy. (Tr. 20.) Thus, the court

affirms the ALJ's Step Five analysis and his determination that significant work exists in the

national economy that Claimant can perform based on his age, education, work experience, and

RFC.

The ALJ's determination that Claimant was not disabled was based on substantial evidence in the record.  In reviewing the evidence, the ALJ created a logical bridge from the record to his conclusion at each step in the analysis.  Accordingly, the court affirms the ALJ's decision.

**VIII.  Conclusion**

For the foregoing reasons, the Claimant's motion for summary judgment is denied and Commissioner's motion for summary judgment is granted.

**E N T E R:**

_____

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE**: July 22, 2009